### LEA v. DURHAM AND NORTHERN RAILROAD CO.

(Filed December 23, 1901.)

NEGLIGENCE—*Contributory Negligence.*

> Where the person killed and the railroad are each guilty of negligence, and both are on equal terms, having equal opportunities, the railroad is not liable in damages for the killing.

CLARK and DOUGLAS, J.J., dissenting.

ACTION by John S. Lea, administrator of. Sidney Lea, against the Durham and Northern Railway Company and the Seaboard Air Line, heard by Judge *T. J. Shaw* and a jury, at August Term, 1901, of the Superior Court of PER-

SON County. From a judgment for the plaintiff, the defendants appealed.

*W. W. Kitchin,* for the plaintiff.
*Winston & Fuller,* for the defendants.

FURCHES, C. J.  Sidney Lea, the intestate of the plaintiff, was run over and killed by defendant's freight train in the city of Durham, about 8 o'clock in the morning, on or about the 1st day of November, 1900.  The defendant, for the purpose of making up a freight train, was moving two freight cars, with an engine between them, and the deceased was standing on the end of the cross-ties of the defendant road.

The defendant's track is on the north side of one of the streets of Durham, and is not used as a street, though persons occasionally travel it on foot, there being a clear street of fifty feet besides that portion occupied by defendant's road, kept up by the city as a street, and was in good condition at that time.  There was no one on the front car in the direction the train was moving at the time the intestate was killed.  And it was in evidence that the city of Durham had an ordinance against running a train more than eight miles an hour; and there was evidence tending to show that this train was running at a greater rate of speed than the ordinance allowed at the time the intestate was killed.  There was also evidence tending to show that no bell was rung or whistle sounded by the defendant.  Wiley Weaver, a boy about 14 years old, testified: "We walked near the track about ten minutes; we were going around to see the town; went by a fine house, looked at the yard, and went by a street near the railroad, and we stopped to look at some letters on the house, and then we stepped out there to look at the train couple up; and he asked me if I knew what the letters were,

and I told him 'No,' I did not; to come and let us go to market; he said to hold on a minute, he would see the train couple up and he would go, and I turned around and said, 'Come on, I'm in a hurry,' and he said, 'Go on, I'll catch you,' and I turned and looked back and the train was in about two yards of him, and I told him to look out, the train would run over him, and that is all I think of; * * * about the time I called him, the train struck him on side under his arm rather from the back."

There are no exceptions in the Judge's charge, but at the close of his charge he says: "Defendant excepts to the Court, giving so much of the charge as is embraced in numbers 1 to 2, 3 to 4, and 5 to 6." And upon examination we find that no such numbers appear in the charge. This throws upon us the burden of examining the entire charge, or, in other words, makes it a broadside exception. There has certainly been carelessness in making up the case on appeal or in making out the transcript of record. But the point in the case, as we view it, seems to be sufficiently presented by the defendant's prayers for instruction and their refusal by the Court.

There are quite a number of prayers for instruction on the part of defendant. A number of them are refused "except as given in the charge," and, as the case is made up, there is nothing to point us to that part not given; while a number of them are refused without any reference to what is given in the charge, and we prefer to put our opinion on those.

The main question, and the one upon which the case depends, as we think, is the contributory negligence of plaintiff's intestate; and this is presented by defendant's fifth and seventh prayers for instruction, both of which the Court refused to give. The fifth prayer is as follows:

"That taking the plaintiff's evidence, and also the defendant's evidence (which latter does not furnish any contradic-

tion as bearing upon the third issue), and the conclusion could not reasonably be avoided that the plaintiff's intestate, by his own negligence, contributed to cause the injury."

The seventh prayer is as follows: "In this case, taking all the evidence together, there was nothing which placed the intestate at any disadvantage as regards avoidance of this injury, and when such is the case no recovery can be had when each party, that is to say, both intestate and the railroad company, were negligent."

We think the defendant and the intestate were both guilty of negligence; this was so found by the jury under the instruction of the Court, and was not excepted to. The intestate was killed in broad daylight, about 8 o'clock in the morning. It is true, he was killed in the city of Durham, on the defendant's railroad track, which is constructed on the north side of the street, not used as a part of the street—there being fifty feet of said street in good condition and unobstructed in any way.

It is contended by the plaintiff that this is a fact in its favor, in determining the liability of the defendant, but it does not appear so to us. It may be a reason going to show the defendant's negligence, but this does not help the plaintiff, as the defendant is found to have been negligent. And it may be a reason why the intestate should have exercised more care, as he was in town on the railroad track and saw that the road was engaged in shifting cars and making up a train. But this has but little to do with the case, as presented to us, as the intestate was also found to be guilty of negligence. Nor do we see that the testimony of Wiley Weaver affects the case. He says that he looked back, the train was in two yards of intestate, *and struck him just about the time he called to him to look out or he would be struck.* This being so, the rate of speed at which the train was moving could have had no effect; it was too late when he called

to do any good, as the intestate was stricken *just about the time* this warning was given. The intestate was not killed at a street crossing, nor on a track much used, even as a footway. The case does not fall under any of the exceptions that require that the whistle should be sounded or the bell should be rung, or the train stopped. He was not an infant, as in Bottom's case, 109 N. C., 72; nor drunk and down, as in Lloyd's case, 118 N. C., 1011; nor prostrate on the track, as in Dean's case, 107 N. C., 686; nor on a trestle, nor in any other dangerous situation putting him at a disadvantage, as in Clark's case, 109 N. C., 430, or Mc-Lamb's case, 122 N. C., 862; nor was it in the night time with no headlight, as in Stanly's case, 120 N. C., 514, and Purnell's case, 122 N. C., 832; nor was he at a crossing, as in Edwards' case at this term. And the doctrine of the last clear chance—proximate cause—does not arise in this case. Both were guilty of negligence, and both were on equal terms. The intestate was at no disadvantage. He was on equal opportunities with the defendant. *Neal v. Railroad,* 126 N. C., 639. The intestate was, unfortunately, killed, but it will not do to say that the railroad company is liable in damages for every man killed by its trains.

So far as we remember, every principle involved in this case is decided in Neal's case, and that case must control this case. We do not think the plaintiff was entitled to recover upon the evidence.

There was another question presented by the case on appeal—as to the receipt given by the plaintiff—but we have not found it necessary to consider that matter.

There was error in refusing the fifth and seventh prayers of defendant for instructions to the jury.

Error—New Trial.

DOUGLAS, J., dissenting. I am forced to dissent from the

opinion of the Court. I dissented in *Neal v. Railroad,* 126 N. C., 634, 647, and in *Stewart v. Railroad,* 128 N. C., 517, 519. It is useless for me to repeat now what I said therein. In my opinion, the Court in the case at bar goes far beyond either of those cases, and establishes a new and most dangerous precedent. Neal's case is cited as its controlling authority, but that case is authority only in so far as the two coincide. Beyond that point, it becomes by its own limitation an authority to the contrary. Neal's case is put upon the exclusive ground that *all* the testimony in the case was introduced by the *plaintiff,* and therefore could not be discredited by him. To prevent any possible injustice to the Court, I will quote its own words, on page 641, which are as follows: "But the Court could not do that (submit the case to the jury) without impeaching the plaintiff's witnesses. *All* the evidence was offered by the *plaintiff,* and the defendant had demurred to it. This was an admission by the defendant that the evidence was true. The plaintiff, by offering the evidence, had vouched for its credit. He could not impeach its credit. As to the plaintiff, it stood unimpeached and unimpeachable. It is true that if the plaintiff offered other evidence tending to show the facts different, then it would have become a matter for the jury as to which witness they would believe. But both witnesses stand alike credited, so far as the plaintiff or the party introducing them is concerned. If this evidence, *or any part of it, had been introduced by the defendant,* it would have been the duty of the Court *to submit it to the jury,* because the plaintiff would not have been bound to give credit to the defendant's witnesses, and the defendant could not give them credit by demurring to their evidence." Is this any authority for the opinion of the Court in the case at bar? What are the special instructions which the Court says the Court below should have given to the jury? They are as follows, including the

words in parenthesis: "That, taking the plaintiff's evidence, *and also the defendant's evidence* (which latter does not fur· nish any contradiction as bearing upon the third issue), and the conclusion could not be reasonably avoided that the plaintiff's intestate, by his own negligence, contributed to cause the injury." This, of course, amounts to a peremptory direction of the verdict, which is equivalent to taking the case from the jury. What, then, becomes of the rule laid down in Neal's case that "if the evidence, or any part of it, had been introduced by the *defendant,* it would have been the duty of the Court to submit it to the jury"?

The seventh prayer, which the Court says should also have been given to the jury is as follows: "In this case, taking all the evidence together, there was nothing which placed the intestate at any disadvantage as regards avoidance of his injury, and when such is the case no recovery can be had, when each party, that is to say, both intestate and the railroad company were negligent." As the defendant introduced more witnesses than the plaintiff, again what becomes of Neal's case?

The opinion of the Court says: "The defendant's track is on the north side of one of the streets, and is not used as a street, though persons occasionally travel it on foot, there being a · clear street of fifty feet besides that portion occupied by defendant's road, kept up by the city as a street, and was in good condition at that time." Nearly the whole of this sentence is taken from the defendant's testimony, and is not corroborated in the slightest degree by the testimony of the plaintiff. In the light of our decisions, can we say that an affirmative issue can be answered by the Court solely upon the testimony of the party on whom rests the burden of proof? In other words, the opinion holds in substance that his Honor should have directed an affirmative verdict of contributory negligence on the testimony of the defendant

without leaving to the jury even the question of the credibility of the defendant's witnesses. Who has vouched for the defendant's witnesses? Certainly the plaintiff has not done so; nor does it appear that the Court below, or the jury, have done so to any appreciable extent. I do not mean to say that the defendant's testimony is not true, but simply that we have no right to pass upon its truth. And yet this Court assumes their testimony to be true, the credibility of which, under the uniform decisions of this Court, is a question exclusively within the province of the jury.

There is another essential difference between Neal's case and that at bar. Neal's intestate was not on the public highway, and was, therefore, a trespasser, or, at most, a licensee. Here, the intestate *was* on the public highway, and therefore his mere presence on the track was not *per se* contributory negligence, nor even *prima facie* evidence thereof. I do not think it would be any evidence at all unless he were negligent in other respects. In this opinion, the italics are mostly my own, used to direct attention to words or expressions on which I chiefly rely.

This opinion has been received by me in the closing days of the session, too late to permit a full citation of authorities. In the extreme pressure of other cases, I can give only a few quotations from standard authorities.

"When the railroad is laid *along a highway,* and the cars are restricted to a moderate speed, such as ordinary vehicles use, travellers have the same right to drive or walk upon it that they would have if the track were not there; and the rights of both parties are equal." Shearman and Redfield on Negligence, sec. 480.

"As a general rule, a railroad company has the exclusive rigt to use its own track, and one who goes upon it without an invitation or license from the company, is a trespasser. But this rule *does not apply* at highway crossings, nor, under

ordinary circumstances, where the track is laid *longitudinally* upon the surface of a street, whether it be that of a commercial or a street railroad company. The public, exercising due care, still have a right to use the street. And so, the railroad company, likewise exercising due care, has also the right to use that portion of the street upon which its track is laid. Their rights are, in most respects, *mutual, reciprocal and equal,* neither being superior or paramount to the other, except that, as the company can not so readily stop its trains or cars and is confined to its track, it has the right of way of passage thereon, and persons who are upon the track must leave it and give way until the train or car has passed." Elliott on Roads and Streets, sec. 810.

"Where a railroad runs along the surface of a street, the rights of the company and of travelers must be exercised with due regard to the rights of the other, in a reasonable and duly careful manner." *Ibid,* sec. 811. The same rule is laid down in 3 Elliott Railroads, sec. 1094.

As the authorities generally make no distinction between "commercial" and street railways, when laid longitudinally along a public street, where the public have a right to be, the case of *Moore v. Electric St. Ry. Co.,* 128 N. C., 455, with the authorities therein cited, would seem to apply to the case at bar. Another material point relates to the continuing negligence of the defendant in driving its train at an unlawful speed, and failing to ring the bell and to have a flagman stationed upon the leading car. The plaintiff introduced the city ordinances, which contained the following: "No train or engine shall be run in the corporate limits of the city of Durham at a greater rate of speed than eight miles an hour." He also introduced the rules of the defendant company, containing the following: "367.—The engine bell must be rung while moving within the corporate limits of towns or cities." 408.—"When a train is being pushed by an engine (except

when shifting and making up trains in yards). a flagman must be stationed in a conspicuous position on the front of the leading car, to immediately signal the engineer in case of danger." Can there be any doubt that, if these rules had been observed, the injury could have been prevented? Even if the intestate had not heard the bell, a brakeman stationed on the front of the leading car, if one had been there, could have warned him off in time, or have stopped the train if it were going less than eight miles an hour. It has been repeatedly held that the public have a right to presume that a railroad company will obey the law. Shearman and Redfield on Negligence says: "Section 473.—Travellers have a right to expect that railroad trains will be managed in conformity to law, including statutes and ordinances, and they are generally not negligent in acting upon the assumption that speed will be limited or signals given, as required by law."

Elliott on Roads and Streets says, in section 811: "The violation of an ordinance or statute requiring a 'lookout' or limiting the speed, or the like, is at least *prima facie,* if not conclusive, evidence of negligence." See also *Mitchell v. Electric Co.,* at this term, and *Railway v. Ives,* 144 U. S., 408, 418.

One more quotation, and I am done. In *Pennsylvania v. Ogier,* 35 Pa. St., 60, a jurisdiction that has certainly never shown any disposition to needlessly hamper the operation of a railroad, the Court says: "But there were other considerations to be taken into account here. If there was no notice by blowing the whistle, a thing required to be done before reaching the point, and usually done, a traveller accustomed to expect this, would not only not be so likely to look out for danger, or be in such a preparedness to avoid it as he likewise might have been, and this without any culpable negligence on his part. For, if by negligence or omission of

LEA *v.* RAILROAD.

those in charge of the train, his vigilance was allayed, they are not at liberty to impute the consequences of their acts to his want of vigilance, a quality of which they deprived him. If their acts brought him within the boundaries of peril, they must answer for the results of that condition. If, therefore, he had a right to expect to hear the whistle sounded at a sufficient distance from the crossing, and did not, it is evident a different degree of care or vigilance might follow. Care is undoubtdly a relative term, or rather conveys a relative idea, as to the degree necessary to be observed under circumstances. It is different, certainly, when there is reason to apprehend danger, from that degree to be exercised where it is not to be apprehended."

It may be said that there is no evidence that the intestate knew of any such rules or ordinances. There is no evidence that he did not. He is not here to answer. His mouth has been closed forever by the defendant. I respectfully dissent from the opinion of the Court.

CLARK, J., concurs in the dissenting opinion.